**Talia Y. Guerriero**, OSB No. 115271
talia@beaconforjustice.com
BEACON EMPLOYMENT LAW
1000 SW Broadway, Suite 2130
Portland, OR 97205
T: 503-673-1388
F: 503-564-4689

**Caitlin Mitchell**, OSB No. 123964
cmitchell@justicelawyers.com
JOHNSON, JOHNSON, LUCAS & MIDDLETON
975 Oak Street, Suite 1050
Eugene, OR 97401
T: 541-484-2434
F: 541-484-0882

**Of Attorneys for Plaintiff**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| **NICHOLE SUSANNE BAIN**, | Case No. 6:24-cv-01714 |
| Plaintiff, | **COMPLAINT** |
| v. | **UNLAWFUL EMPLOYMENT PRACTICES**: ORS 659A.030 – Sexual Harassment and Sex, Gender, Race, and Color Discrimination and Retaliation; ORS 653.641 – Sick Leave Retaliation & Interference; Wrongful Discharge; ORS 659A.112, ORS 659A.118 – Disability Discrimination; ORS 659A.030(1)(g) – |
| **JINNAH INTERNAL MEDICINE, LLC,** an Oregon limited liability company, and **SHEHZAD JINNAH,** an individual, | |
| Defendants. | |

Aiding, Abetting, Inciting, Compelling, or
Coercing Unlawful Employment Practices

**WAGE AND HOUR VIOLATIONS**: FLSA 29
U.S.C. §§ 207, 215 and ORS
653.261 – Overtime Violations;
ORS 652.610 – Unlawful Deductions;
ORS 652.140 – Final Paycheck Violations

**DEMAND FOR JURY TRIAL**

**INTRODUCTION**

1.

For nearly three years, Defendants Jinnah Internal Medicine, LLC and Shehzad

Jinnah subjected Plaintiff Nichole Bain to pervasive harassing and controlling behaviors

and frequent demeaning racial and sexual comments, thereby creating a hostile work

environment. Dr. Jinnah told Ms. Bain that men are like "gods" and women should not talk

back and should do what the men tell them. He instructed Ms. Bain to clean the office

while he watched and micromanaged her. He commented frequently on her weight, hair,

"hourglass" figure, and dating and sex life. He told her she could use a dildo and suggested

that she date women. Dr. Jinnah made himself Ms. Bain's prescribing doctor for depression

and anxiety medications and then told her she should put a gun by her nightstand and blow

her brains out if things got so bad with her mental health. These are just a few examples of

Dr. Jinnah's offensive and humiliating behavior.

Dr. Jinnah also demanded that Ms. Bain make herself available for him around the

clock without overtime pay and ignored any boundaries she tried to set. When the unlawful

harassment of Ms. Bain caused her so much mental distress that she was forced to take

sick leave and did not immediately respond to his workplace demands, Dr. Jinnah fired her.

As such, Plaintiff Nichole Bain alleges the following Complaint against Defendants:

**PARTIES AND VENUE**

2.

**Plaintiff Nichole Bain** is a Black woman, is a resident and citizen of Lane County,

Oregon, and was an "employee" of Jinnah Internal Medicine, LLC pursuant to ORS

659A.001, ORS 652.210, ORS 653.010, and 29 U.S.C. § 203(e)(1).

3.

**Defendant Jinnah Internal Medicine, LLC** is an Oregon limited liability company

with its principal place of business in Eugene, Oregon and is an "employer" pursuant to

ORS 659A.001, ORS 652.210, ORS 653.010, and 29 U.S.C. § 203(d).

4.

At all relevant times, Defendant Jinnah Internal Medicine's volume of sales or

business was $500,000 or more on an annual basis for the relevant period.

5.

At all relevant times, Defendant Jinnah Internal Medicine has had two or more

employees either engaged in (a) "commerce or in the production of goods for commerce,"

as defined in 29 U.S.C. § 203(s)(1)(A)(i), or (b) "handling, selling or otherwise working on

goods or materials that have been moved in or produced for commerce by any person" as

defined in 29 U.S.C. § 203(s)(1)(A)(i).

6.

Defendant Shehzad Jinnah is a resident and citizen of Lane County, Oregon and is a "person" pursuant to ORS 659A.001 and ORS 653.641.

7.

At all material times, Plaintiff was supervised by Defendant Jinnah and Defendant Jinnah Internal Medicine, LLC's employees or agents, and Plaintiff relied on the actual or apparent authority of Defendant Jinnah Internal Medicine, LLC's employees, supervisors, and management.

8.

 This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because an issue in this case arises under federal law. This Court also has supplemental jurisdiction over Plaintiff's state claims pursuant to 42 U.S.C. § 1367 because the state claims arise from the same nucleus of operative facts as the federal claims.

9.

This Court is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in the District of Oregon, Eugene Division.

**STATEMENT OF FACTS**

10.

On or around January 26, 2021, Dr. Jinnah hired Ms. Bain as a Medical Assistant. Ms. Bain's duties included routine tasks, such as patient calendaring, coordinating, and

registration; performing basic medical procedures like taking vital signs; processing

prescriptions and medical insurance claims; ordering medical supplies and medications

(including from out-of-state and Canada); and processing payments with interstate

banking, insurance, and finance systems. In the course of Ms. Bain's duties, she handled or

otherwise used materials that have been moved or produced in interstate commerce.

11.

During the entirety of Plaintiff's employment, she was a non-exempt employee

pursuant to FLSA and frequently worked more than 40 hours per week. Defendants knew

that Plaintiff frequently worked more than 40 hours per week, but Defendants improperly

treated Plaintiff as an exempt employee and regularly failed to pay her overtime.

12.

Defendants' failure to pay Plaintiff overtime wages at the rate required by the FLSA

for all time worked in excess of 40 hours per workweek was willful and was not in good

faith.

13.

Dr. Jinnah and Ms. Bain were the only two full-time employees for Jinnah Internal

Medicine, along with part-time student intern employees. Dr. Jinnah was Ms. Bain's

supervisor, and he informed her that he was the only person to whom she could report

sexual harassment and discrimination.

/ / /

/ / /

14.

At the outset of Ms. Bain's employment, Dr. Jinnah acted in an extremely generous and nice manner. He said he would give Ms. Bain bonuses for helping him build up his practice, and he randomly gave her gift cards. He invited Ms. Bain to come to the clinic with her children on the weekends so he could buy them lunch or dinner. He gave her children gifts.

15.

After a few months of this grooming behavior, Dr. Jinnah began to make inappropriate comments about Ms. Bain's body, other women, and his female patients. For example, Dr. Jinnah told Ms. Bain that he gets along better with "smiley", "cute", "sweet", and "friendly" females and that the reason he got along with Ms. Bain was because she does "not talk back to him."

16.

For the next three years, Dr. Jinnah engaged in repeated cycles of emotional manipulation, employing controlling, sexist, and abusive tactics and making highly inappropriate sexual comments. Some of the many examples include:

a. Dr. Jinnah repeatedly referred to women, including his former female employees and patients, as "fat," "bitches," "dumb bitches," "a complete bitch," "sloppy," and "lazy."

b. Dr. Jinnah said his former female employee was miserable because she was unable to have children and that she was untrustworthy. Dr. Jinnah told Ms. Bain on

multiple occasions that she needed to build trust with him and warned her not to stab him in the back like his former female employee.

c.  Dr. Jinnah told Ms. Bain that men are like "gods" and women should not talk back and should do what the men tell them.

d.  Dr. Jinnah hired female students seemingly based on their physical appearance. After hiring a male student for a week, he commented that he would not bring back another male and prefers "sweet, kind, females."

e.  Dr. Jinnah subjected Ms. Bain to inappropriate, unwanted sexual behavior, including:

   i.  stating that Ms. Bain's face was the prettiest thing about her and that her face attracted a lot of male attention as well as bringing more male patients to the clinic;

   ii.  asking Ms. Bain to wear certain provocative outfits and requesting that she dress in a more feminine way;

   iii.  buying Ms. Bain tight leggings and repeatedly asking her to wear them to work;

   iv.  asking Ms. Bain why she was not wearing make-up or glitter and stating he thought Ms. Bain should wear make-up every day;

   v.  stating in or around April 2022 that Ms. Bain did not need a partner, that a lot of women are happy pleasing themselves, and that there are so many sex toys she could use, including a dildo;

vi.   asking in or around June of 2022 if he could put a picture of Ms. Bain
wearing thigh-high boots and a dress in the clinic's brochure for the
purpose of attracting more men to the clinic;

vii.  asking in or around August 2022 whether Ms. Bain should be eating
lunch because her scrubs were getting too tight;

viii. commenting in or around August 2022 that Ms. Bain had a beautiful
hourglass shape with a very small waist and a heavier bottom half but
that she could probably lose weight;

ix.   stating in or around September 2022 that Ms. Bain was gaining weight
and that she should wear the clothes he had previously bought so he
could see how they fit her;

x.    stating that Ms. Bain's face looked much better after she lost weight
due to a stomach bug in or around September 2022 and that her face
had been getting "pretty bad" (in reference to her weight);

xi.   stating in or around February 2023 that Ms. Bain should go on walks
during her lunch break to maintain her "coke bottle" figure;

xii.  commenting in the summer of 2023 on the muscle tone of a patient's
body, telling Ms. Bain she should go to Planet Fitness so she can work
on toning the bottom half of her body, and stating that he admires and
stares at the women in the gym lifting weights who have strong bodies
and no ounce of fat on them;

xiii.   making a statement on or around September 8, 2023, along the lines

of: "Oh wow Nikki you look great wow let me see that outfit. Oh yeah

you can tell you've lost some weight. Look at that, turn around, this is

how you should dress all the time" and stating to a bystander, "look it

hides her wide hips that she can't lose because it's hereditary;"

xiv.   commenting on Ms. Bain's "backside" while she wore the leggings he

bought her;

xv.   stating that Ms. Bain's summer dress was "beautiful" and that she

should take off her jean jacket and wear a dress like that every day;

xvi.   stating that all women should wear heels and dresses, and expressing

discontent that women these days just want to wear pants;

xvii.   stating on or around November 13, 2023, that Ms. Bain was more

beautiful since she lost weight, and now all the men older than 75

really like coming to the clinic to admire her;

xviii.   responding that the male patients who made Ms. Bain feel

uncomfortable were "harmless" despite the fact that they were

kissing her on the hand, commenting on her eyes and how beautiful

she was, asking for hugs, commenting on how she could be single,

and commenting that they would love to take her out;

xix.   laughing while saying in front of three other people on or around

February 27, 2023, after Ms. Bain returned from a walk in windy

weather, that Ms. Bain looked sweaty and unappealing and he hoped

she had burned a lot of calories, which was utterly degrading and

humiliating;

xx.   asking whether Ms. Bain was on dating websites or if she was dating

anyone;

xxi.   stating that Ms. Bain did not need to be on a dating website to find

anyone and should just buy or use a dildo like other women; and

xxii.   suggesting Ms. Bain should try to date women, including in the

following text exchange:



17.

Dr. Jinnah also made highly sexualized comments that were unwanted and made

Ms. Bain feel extremely uncomfortable. For example, on or around February 27, 2023, Dr.

Jinnah stated, in a manner that was clearly intended to be sexual in nature: "oh don't you

hate it when the light turns off in [the bathroom] it's like I really have to just grab it and hold

onto it, and hopefully I don't spray all over the place." Dr. Jinnah also had a highly unusual

and strange habit of taking his laptop into the only available single-stall restroom – wherein he always kept a jar of Vaseline – and spending inordinate amounts of time occupying it.

18.

During Ms. Bain's tenure, Dr. Jinnah also made numerous negative, demeaning comments about her race or color, including:

a. commenting in or around August 2022 that Ms. Bain should not spend time in the sun, so her skin did not get darker because he preferred lighter complexions;

b. commenting that Ms. Bain should look into surgery and skin-lightening products to lighten her skin color;

c. asking about Ms. Bain's nationality and then stating with surprise that he did not know that she was Black when he hired her;

d. asking why Ms. Bain's hair was big and curly and stating that he did not like it that way while commenting that another woman had beautiful blonde hair; and

e. saying in an unhappy tone that he never knew what kind of hairstyle Ms. Bain would show up in.

19.

Dr. Jinnah engaged in other extremely inappropriate, sexualized behavior in front of Ms. Bain, including:

a. In or around October of 2023, Dr. Jinnah commented on a patient's breasts while giving a physical exam, stating that they were perfect and natural looking and asking where she "got them done."

b.  Dr. Jinnah frequently commented on how beautiful or perfect female patients'
    vaginas and cervixes looked during a pelvic exam.

c.  Dr. Jinnah made comments along the lines of "that's what a vagina looks like when
    you only use toys."

d.  Another patient complained that Dr. Jinnah would rub his genitals up against her leg.

20.

Dr. Jinnah also subjected Ms. Bain to sexualized and misogynist behavior involving
Dr. Jinnah's wife, including:

a.  Dr. Jinnah commented on how a "good wife" acts or dresses, including describing
    that a good wife should dress "to the nines" and wear perfume and do their nails. Dr.
    Jinnah described that he dresses his wife and that his wife was required to come to
    him to get approval for her outfits and would change if he did not like them.

b.  When Dr. Jinnah's wife came to the office, he would comment to everyone present
    on his wife's appearance, stating how good and beautiful she looked, and would
    describe her outfit from head to toe and refer to her as "sweetie."

c.  Dr. Jinnah once stated "I wish my wife would bring home a female" alluding to a
    sexual encounter.

d.  Dr. Jinnah asked Ms. Bain to help his wife get a job at Lululemon, describing that he
    liked going into the store because "all the girls who work there were a size zero" and
    he "liked it when girls wore crop tops and little leggings." Dr. Jinnah subsequently

gave Ms. Bain leggings from Lululemon and repeatedly asked her to wear them to work so he could "see how they fit her."

e.  Dr. Jinnah would make statements about how "sweet" his wife is and about how his wife does not "talk back," "takes care of the whole house," serves his meals first before she eats, cleans his dishes, and will do whatever he tells her to do. Dr. Jinnah would also follow these types of comments up with statements about how he liked it when Ms. Bain was sweet and kind, like his wife.

21.

Likewise, Dr. Jinnah ordered Ms. Bain to do the cleaning and menial tasks that he expected his wife to do at home. The tasks were clearly not related to her role as a medical assistant. They included:

a.  Dr. Jinnah ordered Ms. Bain to do the laundry and to come in after hours to clean the entire office rather than hiring a professional cleaner. Dr. Jinnah severely underpaid Ms. Bain for her hours worked on these cleaning weekends, giving her only $50-$100 for approximately 8 hours of after-hours cleaning chores.

b.  During work hours, Dr. Jinnah ordered Ms. Bain to clean up after him or his patients, including vacuuming up crumbs or washing dishes, and cleaning the toilet between every visit. Dr. Jinnah watched Ms. Bain while she cleaned and frequently interjected to tell her she was not doing it correctly and show her how to do it.

c.  Dr. Jinnah ordered Ms. Bain to help him with personal tasks like finding a dry cleaner.

/ / /

22.

Dr. Jinnah's sexual and racial comments were unwelcome and made Ms. Bain feel extremely uncomfortable, which she expressed via her facial expressions, walking away (if possible), or verbally stating her discomfort. For example, Ms. Bain would state "That's disgusting," "Wow," "I don't like how you talk to me," or "Dr. Jinnah, really?!?" Often, Dr. Jinnah would respond by laughing in a mocking manner and saying he was "just joking."

23.

On or around November 11, 2021, Dr. Jinnah prescribed Sudafed and Codeine syrup in Ms. Bain's name and directed her to go pick them up so that he could then give them to his wife and daughter. Ms. Bain complied out of fear of disobeying her boss's orders.

24.

In approximately Spring of 2021, Ms. Bain disclosed to Dr. Jinnah that she suffered from depression, which in large part was caused by her working conditions. Dr. Jinnah prescribed Ms. Bain Paxil, which put him in control of her access to mental health medications. Ms. Bain indicated she preferred to go to Dr. Reddy – their officemate – for the prescription but he stated "No, you work for me, I'll do it." In or around January 2022, Dr. Jinnah used Ms. Bain's mental health to demean her, stating that Ms. Bain should put a gun by her nightstand and blow her brains out if things got so bad with her mental health.

/ / /

/ / /

/ / /

25.

Dr. Jinnah expressed his belief that Ms. Bain's job, as a woman, was to serve him by taking every opportunity to assert authority and control over her, including but not limited to the following:

a.  interfering with her time and activities outside of work and changing workplace policies, like cell phone usage, on a whim;

b.  directing Ms. Bain to be available to answer his calls at any hour, including on weekends and after hours, without overtime compensation, and threatening her with termination if she did not comply;

c.  exercising inordinate control in allowing or prohibiting Ms. Bain to utilize her paid time off – even including mandatory breaks or approval of vacation or sick time – dependent entirely on his drastic mood swings;

d.  ordering Ms. Bain to share details of why she needed certain time off and denying it if he did not think it was important;

e.  yelling at Ms. Bain when she disagreed with his PTO decisions, and telling her she should be "thankful" for what he pays her;

f.  using Ms. Bain's breaks and lunches as a mechanism of control, prohibiting her from having breaks and often failing to let her complete her lunches;

g.  ordering Ms. Bain to go to the store to get him candy during the time she was supposed to have a break; and

/ / /

h.  attempting to isolate Ms. Bain, repeatedly telling her that he did not want her talking or having "side conversations" with Dr. Reddy and her staff because he wanted complete loyalty from Ms. Bain.

26.

Instead of giving Ms. Bain a set amount of expected PTO, Dr. Jinnah would tell Ms. Bain that he would give her more PTO if she worked well with him and was accessible to him even in her off-hours. When Ms. Bain asked for time off, Dr. Jinnah would grant it or withhold it based on his mood and ask invasive questions about what Ms. Bain was doing with her time off. When Ms. Bain was off work, Dr. Jinnah often called and texted her about work. For example, when she had COVID in or around January of 2022, Dr. Jinnah called and texted her repeatedly to help him with work tasks, including texting "I will send you emails if there are questions. Please look at them," and "Please pick up your phone." Frequently when Ms. Bain took time off work, Dr. Jinnah was rude to her the next day she was back in the office. As a result, Ms. Bain tried her best to walk on eggshells to please Dr. Jinnah and not anger him or take time off.

27.

Dr. Jinnah even micromanaged the way that Ms. Bain said hello to him. One day, he retaliated by ignoring her when she said hello. When Ms. Bain attempted to address his retaliation, he said she did not say hello to him in a "proper" fashion, including by failing to let him see her face when she said hello. Dr. Jinnah described himself as "old-fashioned" and in need of more respect. During the same conversation, Dr, Jinnah commented on Ms.

Bain's figure by describing that she had lost a lot of weight and stated that she should not lose any more weight because then she would look old and haggard.

28.

Dr. Jinnah often exercised inappropriate control over sharing Ms. Bain's personal details with patients, interns and officemates. For example, Dr. Jinnah told an intern Ms. Bain's salary, stated that Ms. Bain was "struggling" as a single mom, and asked how Ms. Bain could have two more children that she could not afford. He told the intern that Ms. Bain was so lucky to work for him.

29.

Dr. Jinnah also made inappropriate comments about other female employees and contractors, including:

a.  stating that one woman needed to be "smilier,"

b.  asking Ms. Bain in or around November 2023, what size top another woman wore so he could buy her something special. When Ms. Bain asked why, Dr. Jinnah said because she is a very beautiful woman and he wanted to take Ms. Bain and the other woman out to eat off the clock, and

c.  telling this other woman, she was beautiful repeatedly, placing his arm around her shoulders, and telling her she did not need a man and should try being with a woman.

All of these behaviors made Ms. Bain extremely uncomfortable.

/ / /

30.

Other women also complained to Ms. Bain about Dr. Jinnah, including a sales representative who said Dr. Jinnah offered his "services" anytime, inappropriately suggested that she meet with him, and complimented her outfits "way too much."

31.

Ms. Bain was unable to report the numerous instances of sexual harassment, discriminatory conduct, retaliation, and ongoing hostile work environment to anyone outside of Dr. Jinnah, who was perpetrating the egregious conduct.

32.

On or around February 16, 2023, Ms. Bain reached out to the Oregon Bureau of Labor & Industries for help by submitting a questionnaire but did not hear back for many months.

33.

In or around March 2023, Dr. Jinnah yelled at and berated Ms. Bain during a conversation about something his female accountant told Ms. Bain. He shouted statements like "do you not understand? What do you not understand about this? Do you know that you're getting paid more than any medical assistant that's ever worked [here]?" Dr. Jinnah also made comments about how "dumb" his female accountant was, that the accountant didn't know what she was talking about, that he prescribed the accountant Xanax just to function, that the accountant messed up on everything, and he should have fired the accountant a long time ago. Dr. Jinnah also stated that if Ms. Bain could not

tolerate the way that he spoke to her, she should find another job but that he also knew she was a single mother and needed the money more than he did.

34.

On or around November 13, 2023, Dr. Jinnah referred to a patient as a "bitch" in front of Ms. Bain and a sales representative, who later texted: "I was shocked when he said bitch about a patient."

35.

On or around November 16, 2023, Ms. Bain tried to fix a broken heater in the office, but it turned out that someone had turned off the furnace. Dr. Jinnah went on a rampage, berating Ms. Bain in front of the other suitemates by yelling she did not have common sense, and she should have called him to bring heaters. At this point, Ms. Bain was beyond her breaking point and started experiencing visible mental health symptoms. Dr. Jinnah commented on Ms. Bain's emotional state and asked if she was okay, to which Ms. Bain responded she was not okay.

36.

After returning home that evening, Ms. Bain continued to experience significant mental health symptoms and texted Dr. Jinnah "I'm not feeling well at all. So, I won't be in tomorrow." Ms. Bain took time off to cope with the mental health repercussions of Dr. Jinnah's treatment.

/ / /

/ / /

37.

While Ms. Bain was out of the office on leave, Dr. Jinnah called and texted her

repeatedly. As Ms. Bain's treating provider, Dr. Jinnah was aware of Ms. Bain's mental

health condition but failed to engage in the interactive process. Instead, Dr. Jinnah texted:

"Later today I will send you an email which won't be pleasant. Please be mindful of your

response since it will have consequences."

38.

On November 19, 2023, Dr. Jinnah emailed Ms. Bain:

> "Effective Monday, November 20, I am asking you to not come in to
> work until I tell you otherwise. Between frequent occurrences of
> unannounced time off and you being distracted at work, I have
> reached the point that I truly do not know whether it is best for you to
> continue to be employed at Jinnah Internal Medicine. To that end,
> please also consider this notice to terminate your employment
> contract effective December 20, 2023. If we are able to move forward
> together, then it will need to be with an amended contract.
> I will notify you when and if I would like you to return to the office. I
> hope you will take this time to consider if you wish to continue
> working with me or whether you would be happier working elsewhere
> in the long run."

39.

On or around November 21, 2023, Dr. Jinnah posted Ms. Bain's position for hire.

40.

Dr. Jinnah's pervasive harassing and controlling behaviors and frequent demeaning

and sexualized comments were unwanted and interfered with Ms. Bain's ability to do her

job and made her extremely anxious and depressed.

/ / /

41.

As a result of the hostile work environment and termination, Ms. Bain has experienced ongoing depression, thoughts of self-harm, hair loss, weight loss and gain, loss of sleep, loss of appetite, anxiety, and lowered self-esteem.

42.

As a result of the unlawful actions alleged herein, Plaintiff has suffered and will continue to suffer, economic damages. Plaintiff is entitled to recover from Defendants such lost wages and benefits of employment and other economic losses in such amount as may be established at trial. Plaintiff is entitled to recover an appropriate amount in lost wages and lost earning capacity in an amount to be determined at trial.

43.

Plaintiff is entitled to a declaration that Defendants acted in violation of the statutes set forth in this complaint for relief and equitable relief enjoining Defendants from future violations of the statutes set forth herein, and such other relief in favor of Plaintiff on such terms as the court may direct.

44.

Defendants have acted with malice and/or have shown a reckless and outrageous indifference to a highly unreasonable risk of harm and have acted with a conscious indifference to the health, safety, and welfare of others.

/ / /

/ / /

45.

Plaintiff is entitled to recover her reasonable attorney's fees, reasonable expert

witness fees, and other costs of the action, including pursuant to ORS 659A.885 and ORS

20.107 as set forth below.

**FIRST CLAIM FOR RELIEF**

**Sexual Harassment and Discrimination Based on Sex/Gender**

**ORS 659A.030(1)(a)-(b)**

**(Against Defendant Jinnah Internal Medicine)**

46.

Plaintiff re-alleges and incorporates by reference the facts and allegations set forth

in the prior paragraphs of this complaint.

47.

Pursuant to ORS 659A.030(1)(a)-(b), it is an unlawful employment practice for an

employer to discriminate against an individual because of their sex and/or gender identity.

48.

**COUNT I - HOSTILE WORK ENVIRONMENT**: Through the actions described in this

Complaint, Defendant created a hostile work environment based on sex and/or gender by

engaging in unwelcome verbal and/or physical conduct that was sufficiently severe or

pervasive to have the purpose or effect of unreasonably interfering with Plaintiff's work

performance or creating a hostile, intimidating or offensive working environment for

Plaintiff.

49.

**COUNT II – INTENTIONAL DISCRIMINATION**:  Defendants treated Plaintiff adversely with respect to terms, conditions, and/or privileges of employment as a result of her sex and/or gender, including by terminating her employment.

50.

Plaintiff's sex and/or gender identity was a substantial factor in Defendants' creation of a hostile work environment as well as Defendants' decision to take adverse actions against Plaintiff, including terminating her employment.

51.

Defendants' violation of ORS 659A.030 directly and proximately caused Plaintiff economic loss and emotional harm.

52.

Defendants' actions caused Plaintiff to suffer economic damages for lost wages, out-of-pocket medical costs, and accrued interest, to be determined at trial.

53.

Defendants' actions have also caused Plaintiff emotional distress and suffering in an amount to be determined at trial.

54.

Pursuant to ORS § 20.107 and ORS § 659A.885, Plaintiff is entitled to recover actual damages, punitive damages, reasonable attorney fees, and costs.

/ / /

55.

Plaintiff also seeks equitable relief including an injunction enjoining Defendants from engaging in any employment practice that discriminates on the bases as alleged in this Complaint.

## SECOND CLAIM FOR RELIEF

### Discrimination Based on Race/Color

### ORS 659A.030(1)(a)-(b)

### (Against Defendant Jinnah Internal Medicine)

56.

Plaintiff re-alleges and incorporates by reference the facts and allegations set forth in the prior paragraphs of this complaint.

57.

Pursuant to ORS 659A.030(1)(a)-(b), it is an unlawful employment practice for an employer to discriminate against an individual because of their race and/or color.

58.

**COUNT I - HOSTILE WORK ENVIRONMENT**: Through the actions described in this Complaint, Defendant created a hostile work environment based on race and/or color by engaging in unwelcome race-based conduct that was sufficiently severe or pervasive to have the purpose or effect of unreasonably interfering with Plaintiff's work performance or creating a hostile, intimidating or offensive working environment for Plaintiff.

/ / /

59.

**COUNT II – INTENTIONAL DISCRIMINATION**:  Through the actions described in this Complaint, Defendants treated Plaintiff adversely with respect to terms, conditions, and/or privileges of employment as a result of her race and/or color, including by terminating her employment.

60.

Plaintiff's race and/or color was a substantial factor in Defendants' creation of a hostile work environment and/or Defendants' decision to take adverse actions against Plaintiff, including terminating her employment.

61.

Defendants' violation of ORS 659A.030 directly and proximately caused Plaintiff economic loss and emotional harm.

62.

Defendants' actions caused Plaintiff to suffer economic damages for lost wages, out-of-pocket medical costs and accrued interest, to be determined at trial.

63.

Defendants' actions have also caused Plaintiff emotional distress and suffering in an amount to be determined at trial.

64.

Pursuant to ORS § 20.107 and ORS § 659A.885, Plaintiff is entitled to recover actual damages, punitive damages, reasonable attorney fees, and costs.

65.

Plaintiff also seeks equitable relief, including an injunction stopping Defendants from engaging in any practice that discriminates on the bases as alleged in this Complaint.

### THIRD CLAIM FOR RELIEF

**Retaliation - ORS 659A.030(1)(f)**

**(Against All Defendants)**

66.

Plaintiff re-alleges and incorporates by reference the facts and allegations set forth in the prior paragraphs of this complaint.

67.

As set forth above, Plaintiff engaged in various activity protected under ORS 659A.030(1)(f) and in opposing what she believed was unlawful activity.

68.

Plaintiff's protected activity was a substantial factor in Defendants' decision to take actions adverse actions against her and terminate her employment and/or to take actions that might deter a reasonable person from engaging in protected activity.

69.

Defendants' violation of ORS 659A.030(1)(f) directly and proximately caused Plaintiff economic loss, emotional harm, and attorney fees and costs.

/ / /

/ / /

70.

Plaintiff realleges damages, costs, and attorneys' fees under as set forth in the paragraphs above.

**FOURTH CLAIM FOR RELIEF**

**ORS 653.641 - Sick Leave Retaliation and Interference**

**(Against All Defendants)**

71.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

72.

ORS 653.641(2) makes it unlawful for an employer or any other person to discriminate or retaliate against or interfere with an employee using, attempting to use, or inquiring about protected sick time.

73.

Defendants interfered with, discriminated against and/or retaliated against Plaintiff for invoking, utilizing and/or attempting to utilize protected sick time by taking adverse employment action, including termination, resulting in damages.

74.

As a result of Defendant's unlawful conduct, Plaintiff has incurred and continues to incur lost wages and benefits in an amount to be proven at trial. Plaintiff will continue to lose income and benefits in the future. Plaintiff is entitled to economic damages, including pursuant to ORS 659A.885.

75.

Plaintiff also seeks her costs and attorneys' fees pursuant to ORS 659A.885.

**FIFTH CLAIM FOR RELIEF**

**Wrongful Discharge**

**(Against All Defendants)**

76.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

77.

An employer commits the tort of wrongful discharge by, among other actions, terminating an employee "for exercising a job-related right that reflects an important public policy." *Yeager v. Providence Health System*, 96 P.3d 862, 865 (Or. App. 2004) (citation omitted).

78.

At all material times, the public policy of Oregon prohibited an employer from retaliating and discriminating against Plaintiff for inquiring about or invoking sick leave protections.

79.

This public policy is embodied in the common law, statutes, and regulations of the State of Oregon including, but not limited to the statutes delineated in the prior counts, and the rules implementing those statutes.

/ / /

80.

Defendants terminated Plaintiff's employment on the basis of Plaintiff's invocation

and inquiry of sick time.

81.

Plaintiff reasserts her claim for damages, costs, and attorneys' fees as set forth

above.

**SIXTH CLAIM FOR RELIEF**

**ORS 659A.112 & ORS 659A.118**

**Disability Discrimination/Failure to Accommodate a Disability**

**(Against Defendant Jinnah Internal Medicine)**

82.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

83.

ORS 659A.112(2)(e) makes it unlawful for an employer to "not make reasonable

accommodation to the known physical or mental limitations of a qualified individual with a

disability[.]"

84.

**COUNT I - REASONABLE ACCOMMODATIONS**: Defendants violated ORS

659A.112(2)(e) and ORS 659A.118 by, without limitation, failing to engage in the interactive

process to determine reasonable accommodations for Plaintiff's disability and failing to

make such accommodations and terminating her employment instead of allowing her leave, resulting in damages.

85.

**COUNT II - DISABILITY DISCRIMINATION**: Defendants violated ORS 659A.112 and ORS 659A.118 by, without limitation, demeaning and disparaging Plaintiff on the basis of her disability, resulting in damages.

86.

As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life all to her non-pecuniary loss in an amount to be determined at trial. Plaintiff is entitled to compensatory damages, including pursuant to ORS 659A.885.

87.

As a result of Defendant's unlawful conduct, Plaintiff has incurred and continues to incur lost wages and benefits in an amount to be proven at trial.  Plaintiff will continue to lose income and benefits in the future. Plaintiff is entitled to economic damages, including pursuant to ORS 659A.885.

88.

Pursuant to ORS § 20.107 and ORS § 659A.885, Plaintiff is entitled to recover actual damages, punitive damages, reasonable attorney fees, and costs.

/ / /

/ / /

89.

Plaintiff also seeks equitable relief including an injunction enjoining Defendants from engaging in any employment practice that discriminates on the bases as alleged in this Complaint.

**SEVENTH CLAIM FOR RELIEF**

**Aiding, Abetting, Compelling, Coercing, or Inciting Discrimination**

**ORS 659A.030(1)(g)**

**(Against Defendant Jinnah)**

90.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

91.

Defendant Jinnah violated ORS 659.030(1)(g) by aiding, abetting, inciting, compelling and/or coercing Defendant Jinnah Internal Medicine in the unlawful employment practices as set forth above, including, but not limited to, gender, sex, race, color, disability, and leave discrimination and interference.

92.

As a direct and proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer mental stress, humiliation, inconvenience, and loss of enjoyment of life all to her non-pecuniary loss in an amount to be determined at trial. Plaintiff is entitled to compensatory damages, including pursuant to ORS 659A.885.

/ / /

93.

As a result of Defendant's unlawful conduct, Plaintiff has incurred and continues to

incur lost wages and benefits in an amount to be proven at trial.  Plaintiff will continue to

lose income and benefits in the future. Plaintiff is entitled to economic damages, including

pursuant to ORS 659A.885.

Pursuant to ORS § 20.107 and ORS § 659A.885, Plaintiff is entitled to recover actual

damages, punitive damages, reasonable attorney fees, and costs.

94.

Plaintiff also seeks equitable relief including an injunction enjoining Defendants from

engaging in any employment practice that discriminates on the bases as alleged in this

Complaint.

**EIGHTH CLAIM FOR RELIEF**

**FLSA Failure to Pay Overtime Wages Based on Regular Rate of Pay**

**in Violation of the FLSA - 29 U.S.C. § 201 *et seq*.**

**(Against All Defendants)**

95.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

96.

Defendants are governed by and subject to 29 U.S.C. § 207. The overtime wage

provisions set forth in the FLSA apply to Defendants to protect Plaintiff.

/ / /

97.

Defendant Jinnah Internal Medicine has been an "enterprise," as defined in FLSA Sections 3(r), 29 U.S.C. § 203(r), with business activities that are related and performed through unified operation or common control for a common business purpose.

98.

At all relevant times, Defendant Jinnah Internal Medicine has been, and continues to be, an "employer" engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. § 201, *et seq*. and as defined by 29 U.S.C. § 203(d).

99.

At all relevant times, Defendant Jinnah Internal Medicine has had two or more "employees engaged in commerce or in the production of goods for commerce," as defined in 29 U.S.C. § 203(s)(1)(A)(i).

100.

At all relevant times, Defendant Jinnah Internal Medicine has had two or more "employees handling, selling or otherwise working on goods or materials that have been moved in or produced for commerce by any person" as defined in 29 U.S.C. § 203(s)(1)(A)(i).

101.

At all relevant times, Defendant Shehzad Jinnah exercised control over significant aspects of the company's day-to-day functions, including compensation of employees.

/ / /

102.

At all relevant times, Defendant has had an annual gross volume of sales made or business done in excess of $500,000.00.

103.

Plaintiff regularly worked more than forty hours in a workweek for which Defendants failed to compensate her. Defendants knew that it did not pay Plaintiff at the proper overtime rate for all hours worked in excess of forty hours per workweek.

104.

Defendants violated the FLSA, 29 U.S.C. § 201 *et seq*., including 29 U.S.C. §§ 207 and 215(a)(2), by failing to pay Plaintiff at least the overtime wages for all overtime hours worked in all workweeks.

105.

Defendants' actions were willful and/or showed a reckless disregard for the provisions of the FLSA within the meaning of 29 U.S.C. § 255(a).

106.

Pursuant to Section 16(c) of the FLSA, 29 U.S.C. § 216(c), Plaintiff is entitled to (a) her unpaid overtime wages; (b) an additional and equal amount of liquidated damages; (c) interest; and (d) reasonable attorneys' fees and costs of litigation.

/ / /

/ / /

/ / /

**NINTH CLAIM FOR RELIEF**

**Failure to Pay Overtime Wages — ORS 653.261**

**(Against Defendant Jinnah Internal Medicine)**

107.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

108.

Defendant Jinnah Internal Medicine was an "employer" pursuant to ORS 653.010. The overtime wage provisions set forth in ORS Chapter 653 apply to Defendant to protect Plaintiff.

109.

Plaintiff regularly worked more than forty hours in a workweek for which Defendant failed to compensate her. Defendant knew that it did not pay Plaintiff at the proper overtime rate for all hours worked in excess of forty hours per workweek.

110.

Defendant Jinnah Internal Medicine violated ORS 653.261 by failing to pay Plaintiff at least the overtime wages for all overtime hours worked in all workweeks.

111.

As a result of said conduct, Plaintiff is entitled to payment from Defendants of all unpaid wages in an amount to be proven at trial pursuant, prejudgment interest thereon and a penalty pursuant to ORS 653.055.

/ / /

112.

Plaintiff is also entitled to payment of reasonable attorney's fees and costs pursuant to ORS 652.200 and ORS 653.055(4).

**TENTH CLAIM FOR RELIEF**

**ORS 652.610 – Unlawful Deductions/Withholdings**

**(Against Defendant Jinnah Internal Medicine)**

113.

Plaintiff realleges the paragraphs above as fully set forth herein.

114.

Pursuant to ORS 652.610, Defendant was prohibited from withholding, deducting or diverting certain amounts from Plaintiff's wages, except in certain circumstances that are not present here. In taking the actions described above, Defendant withheld, deducted and/or diverted amounts from Plaintiff's wages in violation of the statute.

115.

Defendant also failed to provide the information required by ORS 652.610 in an itemized statement along with Plaintiff's wages.

116.

Plaintiff is entitled to (for each violation) the greater of $200 or actual damages in an amount to be proven at trial, pursuant to ORS 652.615, together with attorney fees, costs, penalties, and pre- and post-judgment interest.

/ / /

**ELEVENTH CLAIM FOR RELIEF**

**Oregon Unpaid Wages Upon Termination Claim – ORS 652.140**

**(Against Defendant Jinnah Internal Medicine)**

117.

Plaintiff re-alleges and incorporates all prior paragraphs of this Complaint.

118.

Pursuant to ORS 652.140, Defendant was required to pay Plaintiff all wages and penalty wages due upon termination of employment by the applicable statutory deadline(s) but willfully failed to do so.

119.

For such violation(s), Plaintiff is entitled to collect all wages remaining due, in an amount to be proven at trial, together with attorneys' fees and costs, as well as pre- and post-judgment interest, and the statutory penalty wages provided by ORS 652.150 and ORS 652.200.

**DEMAND FOR JURY TRIAL**

120.

Plaintiff demands a jury trial on all claims and issues allowed under the law.

**PRAYER FOR RELIEF**

121.

WHEREFORE, Plaintiff requests the following judgments against and relief from Defendants:

a) Economic damages in an amount to be proven at trial;

b) Non-economic damages in an amount to be proven at trial;

c) Reasonable costs and attorney fees;

d) Punitive damages;

e) Liquidated damages;

f) Penalties;

g) Equitable relief including a permanent injunction enjoining Defendants from engaging in any employment practice which discriminates on the bases as alleged in this complaint;

h) Prejudgment and post-judgment interest as appropriate and allowed by law;

i) On all claims, as applicable, amounts necessary to offset the income tax consequences of receiving a lump sum payment, rather than receiving payment of wages over the applicable time frame; and

j) All such other relief as this Court may deem proper.

 DATED October 7, 2024.

**BEACON EMPLOYMENT LAW**

 *s/Talia Y. Guerriero*

Talia Guerriero, OSB No. 115271

**JOHNSON, JOHNSON, LUCAS & MIDDLETON**

 *s/Caitlin Mitchell*

Caitlin Mitchell, OSB No. 123964

*Of Attorneys for Plaintiff*